STATE of Tennessee, Appellee,

v.

**Rose Horne LEAPHART, Appellant.**

**No. 83–5–III.**

Court of Criminal Appeals of Tennessee, at Nashville.

Dec. 20, 1983.

Permission to Appeal Denied by Supreme Court April 2, 1984.

---

Jerry L. Smith, Asst. Atty. Gen., David Raybin, Cheryl Blackburn, Asst. Dist. Attys. Gen., Nashville, for appellee.

Joe P. Binkley, Mike W. Binkley, Patricia R. Young, J. Michael Engle, Nashville, for appellant.

## OPINION

DAUGHTREY, Judge.

The defendant, Rose Horne Leaphart, is a physician who was charged with first degree murder in the slaying of her husband, Bobby Leaphart, a fourth-year dental student. At the time of Bobby Leaphart's death, he and Rose Leaphart had been involved for two years in a marriage marked by a recurring cycle of violence, separation, and reconciliation and punctuated by Bobby's infidelity and chronic drug use. It was the State's theory that in desperation the defendant paid two men $10,000 to kill Bobby Leaphart. Defense counsel conceded that Rose Leaphart was present when her husband was murdered and also that she failed to report the homicide, but argued to the jury both that she was a battered wife and also that she did not actually intend Bobby Leaphart's death. Despite this seeming inconsistency in defenses, the jury apparently was somewhat sympathetic to the defendant's plight, finding her guilty of the lesser offense of second degree murder and imposing a near-minimum 15 year sentence.

On appeal, the defendant challenges (1) the sufficiency of the convicting evidence, (2) the admissibility of a telephone conversation between Bobby Leaphart's former lover and a defense investigator, and (3) the trial court's failure to instruct the jury on self-defense. We find no reversible error in connection with the issues raised on appeal, and we therefore affirm the judgment below.

Bobby Leaphart dropped from sight on January 8, 1981, after attending classes at Meharry Dental School during the day. He was to pick up a classmate to work in the lab at 7:00 or 7:30 that night but never showed up. When the classmate called the

Leaphart residence at Four Seasons Apartments, he was told by Rose Leaphart, "[Bobby] has gone to get that stuff. You know what I mean?"

In point of fact, the proof showed that Bobby Leaphart did not leave the Four Seasons Apartments alive that evening. Instead, he was beaten to death with a baseball bat by Michael Miller and Gary Carlton Jackman, who were hired by the defendant to kill Bobby for $10,000. There is some indication, too, that Rose Leaphart herself may have struck blows to her husband's head. In any event, she later admitted to her secretary, Bernice Elkins, that she had watched as Miller and Jackman did the "messy job" and then helped them stuff Bobby Leaphart's bloody corpse into the trunk of his red M.G. automobile.

The defendant followed in another car as Miller and Jackman drove the M.G. to Atlanta. They planned to leave Bobby's car somewhere in the city and make it appear that he had been killed on a cocaine run. But the M.G. ran out of gas, and the trio abandoned the sportscar—and the body—on the interstate.

The next day the M.G. was towed to a nearby motel parking lot where police searched the interior but not the trunk. The car then was taken to a tow-in lot. It was there, some two months later, that an employee smelled the badly decomposed remains and opened the trunk.

Three or four days later, Atlanta police received an anonymous tip that the death was drug-related, but the information did not check out. Defendant Rose Leaphart and her two cohorts subsequently were arrested and charged with first degree murder.

In addition to Bernice Elkins's testimony about the defendant's damning admission to her, the State presented five witnesses who testified that during the months preceding Bobby Leaphart's death, Rose Leaphart talked of "getting rid of" Bobby, "putting out a contract" on him, hiring someone to "hit" the victim or to "take care of him." These witnesses testified that they had not taken these threats seriously, despite general knowledge on their part that the relationship between the Leapharts was an unhappy one.

Unquestionably, the defendant suffered repeated instances of physical abuse at the hands of Bobby Leaphart. Witnesses for both the prosecution and the defense testified that Bobby broke Rose Leaphart's arm on one occasion and blackened both her eyes on another. There was evidence of other indignities, including a forced drug injection. Even Natasha Overstreet, Bobby's former lover, testified that Bobby said he had grown tired of hitting his wife, but that the more he hit Rose, the more she cooperated.

The defense called a psychology expert who described the "battered wife syndrome" and the cycle that typically characterizes physically abusive marriages. She noted that a spouse caught up in such a cycle may become helpless and be psychologically prevented from leaving the relationship.

The defense also sought to establish that although divorce was counter to Rose Leaphart's religious beliefs, she took other steps to protect herself. For example, at one point she hired an attorney to draw up a reconciliation agreement to insulate her assets. She also moved several times during the marriage, installed an expensive alarm system at her apartment, and hired a body guard. In addition, she took out criminal warrants against her husband on several occasions.

■ From all this evidence, the defendant takes the position that the proof is insufficient to support her conviction for second degree murder. The specific questions she raises on appeal are not persuasive on this point. It is irrelevant, for instance, that the medical examiner was unable to establish the date of Bobby Leaphart's death. The circumstantial proof of his disappearance and the defendant's lengthy pretrial statements to her secretary and to police furnish a surprisingly clear picture of what occurred to Bobby Leaphart on January 8, 1981. It is equally

irrelevant that friends did not take seriously her threats against her husband's life. Moreover, the fact that she was operating under tremendous stress during the months preceding his disappearance arguably bolsters the State's theory of defendant's motive more than it provides her with a defense.

■ Nor do we find any merit to the defendant's contention that the trial court erred in failing to give a requested charge on self-defense. Although it is well-settled that an accused is entitled to an affirmative instruction on every issue fairly raised by the evidence, there is no requirement that the court charge on matters not raised by the proof. *Lester v. State*, 212 Tenn. 338, 370 S.W.2d 405 (1963); *Hicks v. State*, 533 S.W.2d 330 (Tenn.Crim.App.1975). To make out a claim of self-defense under Tennessee law, the accused must establish that danger of death or serious bodily harm was "imminent and impending, 'manifested by some words or overt acts at the time clearly indicative of a present purpose to do injury.'" *Draper v. State*, 63 Tenn. 246, 251 (1874). As emphasized in a more recent opinion by our state high court:

> [T]he defendant must show that *at the time of the killing* he was acting upon a well-founded fear of death or great bodily harm to himself, and that the actions he took were necessary in self-defense.

*State v. Wilson*, 556 S.W.2d 232, 234 (Tenn. 1977) (emphasis in original).

■ Here the record reflects a history of past abuse by the victim against the defendant, but there is simply no proof that Rose Leaphart was in imminent danger of any sort at the time of Bobby Leaphart's killing. Indeed, defense counsel conceded in his opening statement to the jury that "this is not a case classically of self-defense ... [which] is appropriately applied only in circumstances where the attack is immediate, the danger is present at that moment."

We concur in defense counsel's early assessment of the case. In view of the evidence, moreover, it is no surprise that the trial court found that the proof did not support a self-defense claim and thus denied the defendant's request for a special instruction. Nor was it error for the trial court to do so.

■ Finally, we decline to reverse on the basis of what the defendant insists is prejudicial hearsay evidence in the record. Over defense objection, the following exchange between the prosecuting attorney and rebuttal witness Natasha Overstreet took place:

Q: Did [defense investigator Thomas Stevens] give you his opinion as to Dr. Leaphart's moral culpability in this case; yes or no?

A: Yes.

Q: What did he say?

A: But wasn't she justified?

Q: Wasn't she justified. And what was your response to that question?

A: When did she run for the office of God.

We first note that the defendant objected to this testimony not on the basis of hearsay, but on the ground that it represented inadmissible opinion testimony. It was on this basis that the trial court made a ruling, and thus the current hearsay objection comes too late to be considered. Moreover, the implication by the extrajudicial declarant that "his client's actions in this case" were "morally justified" is not inconsistent with the defense offered at trial, and Natasha Overstreet's facetious response, if hearsay at all, was clearly harmless error in view of the overwhelming evidence of guilt.

As the trial court noted at the time, the question put to Overstreet by the State's attorney and her response "[did] not have much probative value" and this line of questioning was probably better left unexplored. It is a tribute to the good judgment, skill, and restraint of the trial attorneys on both sides of this lawsuit that in the 1275 pages of trial transcript, this testimony is the only blemish on the record of which the defendant now complains.

Finding no error in connection with the issues raised on appeal, we affirm the judgment of the trial court.

O'BRIEN and DUNCAN, JJ., concur.