The PEOPLE of the State of Colorado, Plaintiff–Appellant,

v.

Robert BRANDYBERRY and Dennis Whelan, Defendants–Appellees,

No. 88CA1741.

Colorado Court of Appeals,
Div. IV.

Nov. 23, 1990.

Rehearing Denied Jan. 17, 1991

Certiorari Denied June 24, 1991.

Norman S. Early, Jr., Dist. Atty., Nathan B. Coats, Chief Appellate Deputy Dist. Atty., Denver, for plaintiff-appellant.

Holland, Seelen & Pagliuca, Jeffrey S. Pagliuca, Denver, for defendant-appellee Robert Brandyberry.

No appearance for defendant-appellee Dennis Whelan.

Berenbaum & Weinschienk, P.C., Charles A. Bewley, Denver, Joseph E. Broadus, Ar-

lington, Va., for amicus curiae Coalition for Religious Freedom.

Boothby, Ziprick & Yingst, Lee Boothby, Berrien Springs, Me., Cooper & Kelly, P.C., Mick T. Mihm, Denver, Colo., for amicus Curiae National Council of Churches of Christ in the U.S.A. and Council of Religious Freedom.

Opinion by Judge HUME.

Defendants, Robert Brandyberry and Dennis Whelan, were charged by criminal indictment with conspiracy to kidnap and second degree kidnapping. Those charges arose from the forcible seizure and asportation of a 29–year–old member of the Unification Church (church). In a jury trial, defendants were jointly tried and acquitted.

The prosecution appeals, pursuant to § 16–12–102(1), C.R.S. (1986 Repl.Vol. 8A), from a pretrial ruling that allowed defendants to present to the jury evidence in support of an asserted choice of evils defense. The People contend that the court erred in allowing the jury to decide the justification issue without first properly addressing the sufficiency of the evidence offered in support of that defense as required by law. The People also contend that the evidence offered by defendants was legally insufficient to constitute a defense under the Colorado choice of evils statute. We agree with both contentions and disapprove the trial court's ruling.

The evidence supporting the criminal charges was generally undisputed both at the pretrial hearing and at trial. Defendants contracted with the victim's parents to plan and execute her removal from the influence of the church and its members. On May 26, 1987, in furtherance of that plan, defendant Whelan and other members of his "rescue team" forcibly seized the victim from a Denver street and transported her, against her will, to a Douglas County residence, where she was met by her parents, defendant Brandyberry, and other members of the "deprogramming team."

The victim was then held in captivity by defendants and other members of the respective "teams" for several days while "deprogramming" was attempted. During the period of her captivity, the victim was moved to several different locations in Colorado before being transported to Lyons, Kansas, where she escaped from her abductors.

Both defendants testified at a lengthy pretrial *in limine* hearing, and, in addition, they presented testimony from a former church member who had been "deprogrammed" successfully, the father of that former church member who had arranged his son's "rescue" from the church, a social worker, and a psychologist. A number of letters, transcribed statements, and other documents were also admitted for the purpose of demonstrating the basis for defendants' asserted belief that their conduct was necessary to avoid injury to the victim, her parents, and the public.

Defendants' proffered evidence was designed to show the existence of a pervasive pattern of fraudulent recruitment practices and "coercive persuasion" techniques allegedly used by the church to obtain, keep, and control its members, including the victim. Those practices and techniques, according to defendants, were calculated to so indoctrinate, enmesh, and involve recruited members, including the victim, in church-sponsored ideology and activities as to undermine their abilities to think and act freely or independently in their own best interests. The destruction of the victim's ability to think and act freely and autonomously was claimed by the defendants as the injury they sought to avoid and eliminate by their criminal actions.

At the conclusion of the *in limine* hearing, the trial court determined that defendants had presented some credible evidence which, if believed by the jury, was sufficient to establish a justification for the offenses of conspiracy and kidnapping. Thus, the court allowed defendants to present to the jury evidence consistent with that offered at the *in limine* hearing, after determining that the sufficiency of such evidence was ultimately to be decided by the jury.

In its ruling, the court disallowed the defense to the extent that it was based

upon any asserted injury to the public or to the victim's parents. It thus sought to limit the issue to be presented to the jury to a determination whether the victim's then present or prospective condition allegedly resulting from her church membership constituted an imminent, private injury of sufficient gravity to justify defendants' commission of the charged offenses.

However, the effect of the court's ruling was to allow defendants broad latitude in presenting evidence to the jury that focused upon the methods allegedly used by the church to overcome the victim's free will and her ability to exercise her freedom of choice, rather than upon the nature and severity of the alleged injury itself. Thus, the court's ruling permitted broad-ranging inquiry into the church's alleged fraudulent recruiting practices, its methods of securing unquestioning obedience in its members, and its fund-raising and political activities. The court even allowed introduction of evidence as to the character and criminal record of the church's leader, Reverend Moon, to demonstrate that the victim had in fact been deceived by the church. The presentation of such evidence thus extended an invitation to the jury to consider the morality and desirability of church doctrine and practices rather than whether in fact the victim was threatened by the prospect of a grave imminent injury.

■ The Colorado choice of evils statute is rooted in the common law doctrine of necessity. *People v. Strock,* 623 P.2d 42 (Colo.1981). Pursuant to that doctrine, conduct which would otherwise constitute a crime is justifiable and not criminal if the actor engages in such conduct, under extraordinary circumstances, out of necessity to prevent a greater harm from occurring. *See* 1 *Wharton's Criminal Law* § 88 (C.E. Torcia 14th ed. 1978).

Choice of evils is designated by § 18–1–710, C.R.S. (1986 Repl.Vol. 8B) as an affirmative defense that must be properly raised and placed in issue by a defendant's offer or presentation of "some credible evidence." *See* § 18–1–407, C.R.S. (1986 Repl.Vol. 8B).

In enacting other statutory justifications for, or exemptions from, criminal responsibility, the General Assembly has used self-limiting language to define either the character of conduct that may be found to be justified, or the surrounding circumstances in which justification may be found, or both. *See* § 18–1–701 and §§ 18–1–703 through 18–1–709, C.R.S. (1986 Repl.Vol. 8B).

■ Choice of evils, as defined by § 18–1–702, C.R.S. (1986 Repl.Vol. 8B), is potentially available as a defense to any criminal charge unless it is inconsistent with other enumerated affirmative defenses or other explicit provisions of the law. Because of the breadth of the intended applicability of that defense, it is virtually impossible to specify either the character of conduct or the circumstances to which it might apply.

■ However, the common law necessity defense is not available as an instrument for juror nullification of unpopular laws or for juror condonation of crimes committed against persons who espouse or adhere to unorthodox or unpopular ideas or causes that pose no threat of immediate injury. Thus, limitations upon the applicability of the defense have traditionally been recognized and applied to safeguard against its misuse or abuse. *See* W.R. LaFave & A.W. Scott, Jr., *Criminal Law* § 50 at 385 (1972); 1 *Wharton's Criminal Law* §§ 87 & 88 at 408 et seq. (C.E. Torcia 14th ed. 1978).

Similarly, in recognition of the broad scope of the defense's applicability and of its potential for misuse and abuse, the General Assembly provided different and more exacting standards as prerequisites for presentation to a jury of the choice of evils defense than those required for other justification defenses. *See People v. Strock, supra; see also People v. DeHerrera,* 697 P.2d 734 (Colo.1985) (particular statute defining offense is controlling over statute applicable to offenses in general).

Section 18–1–702 provides:

"(1) . . . [C]onduct which would otherwise constitute an offense is justifiable and not criminal when it is necessary as

an emergency measure to avoid an imminent public or private injury which is about to occur by reason of a situation occasioned or developed through no conduct of the actor, and which is of sufficient gravity that, according to ordinary standards of intelligence and morality, the desirability and urgency of avoiding the injury clearly outweigh the desirability of avoiding the injury sought to be prevented by the statute defining the offense in issue.

"(2) The necessity and justifiability of conduct under subsection (1) of this section shall not rest upon considerations pertaining only to the morality and advisability of the statute, either in its general application or with respect to its application to a particular class of cases arising thereunder. When evidence relating to the defense of justification under this section is offered by the defendant, before it is submitted for the consideration of the jury, the court shall first rule as a matter of law whether the claimed facts and circumstances would, if established, constitute a justification."

■ Under the plain language of the statute, evidence in support of the defense must first be proffered or presented to the trial court. *See People v. Strock, supra.* The trial court is required to make a preliminary or threshold determination whether the evidence offered is legally sufficient for presentation to the jury. *Andrews v. People,* 800 P.2d 607 (Colo.1990).

■ In order to determine the legal sufficiency of proffered evidence, the trial court must consider the evidence and rational inferences arising therefrom in the light most favorable to the proffering party, but since legal sufficiency of evidence presents a legal rather than a factual issue, we are not bound by that court's determination. *People v. Quezada,* 731 P.2d 730 (Colo.1987).

■ We must determine, as a matter of law, whether the offer in the record, considered in a light most favorable to defendants, is substantial and sufficient in both "quantity and quality" to support the stat-utory defense. *See People v. Bennett,* 183 Colo. 125, 515 P.2d 466 (1973).

■ In interpreting statutory language, all words and phrases used by the General Assembly must be considered and accorded their familiar and generally accepted meaning. *People v. District Court,* 713 P.2d 918 (Colo.1986). And, because § 18–1–702 is rooted in the common law necessity defense, we may consider established principles relating to the common law defense as an aid to our interpretation of the statute. *See People v. Strock, supra.*

The word "emergency" is defined as "a sudden unexpected happening; a sudden or unexpected occasion for action; a pressing necessity; [or] an unforeseen combination of circumstances that calls for immediate action." *Black's Law Dictionary* 469 (rev. 5th ed. 1979); *see also Webster's Third New International Dictionary* 741.

"Imminent" means "near at hand, impending or on the point of happening." *Black's Law Dictionary, supra,* at 676; *see also Webster's Third New International Dictionary* 1130.

"Urgency" connotes a status demanding immediate attention. *See Webster's Third New International Dictionary* 2521.

"Necessary" is a word susceptible of various meanings, and it must be considered in context with other words with which it is used to ascertain its intended meaning. It may import an absolute requirement, inevitability, or only that which is convenient, appropriate, suitable, or proper. *Black's Law Dictionary, supra,* at 928.

■ Read in context with the words "emergency," "imminent," "urgency," and with the phrase "about to occur," the meaning of "necessity" becomes clear. Thus, taken in context and accorded their ordinary meaning, the words impart an unmistakable legislative intent to limit availability of the choice of evils defense. In order to be entitled to the defense, an actor's criminal conduct must be necessary because of the sudden and unforeseen emergence of a situation requiring the actor's immediate action to prevent the occur-

rence of an imminently impending injury. *Andrews v. People, supra.*

 Thus, here, before offering their evidence to the jury, defendants should have been required to present some credible evidence to the court demonstrating that an immediately impending injury was about to happen to the victim, and that their conduct was necessary to avoid its occurrence. Our review of the record convinces us that they failed to do so.

Defendants proffered no evidence that the victim here had suffered or was about to suffer any bodily injury or impairment resulting from her church affiliation. Nor did the evidence demonstrate that the victim was suffering from any psychiatric disease or mental disorder of sufficient gravity to warrant defendants' immediate intervention.

The evidence reflects that, when the abduction was planned and perpetrated, the victim, despite having been a member of the church for more than six years, was apparently physically and mentally healthy. At best, the proffered evidence suggested only that the victim might suffer some future emotional, psychological, sociological, or economic harm if she continued as a member of the church.

Defendants' argument that they feared that the victim would be injured by her possible future participation in a church-sponsored mass wedding ceremony added little or no substance to their claim that any injury was imminent. Indeed, the evidence showed that the victim had previously participated in a similar ceremony without experiencing any demonstrably significant ill effects upon her health, safety, or well-being.

 Evidence of a generalized fear of future injury is not sufficient to warrant the invocation of a choice of evils defense. The evidence must affirmatively demonstrate the existence of a specific threat or likelihood of an imminent injury necessitating the actor's conduct. *See People v. Robertson,* 36 Colo.App. 367, 543 P.2d 533 (1975).

 Furthermore, if a reasonable legal alternative was available to defendants as a means to avoid the threatened injury, they properly may be foreclosed from asserting a choice of evils defense. *See U.S. v. Bailey,* 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980); *People v. Hocquard,* 64 Mich.App. 331, 236 N.W.2d 72 (1975). In addition, a defendant who seeks to assert a choice of evils defense must offer evidence that his conduct did not exceed that reasonably necessary to avoid the impending injury. *See People v. Handy,* 198 Colo. 556, 603 P.2d 941 (1979).

Here, even if we were to assume that defendants rationally perceived that the victim's membership in the church posed a threat of an imminent injury to her, they failed to show that the remedy they elected to pursue (knowing violation of criminal laws) was the least harmful option available to them for avoiding the threatened injury.

Moreover, there is no evidence that defendants sought assistance or alternative remedies from law enforcement officials or from the courts, either prior to or after kidnapping the victim. Rather, defendants planned the abduction with the victim's parents without benefit of legal advice about what reasonable legal alternatives might be available to avoid any supposed injury to the victim other than the remedy they chose by violating the law. They did not, for example, explore or attempt to pursue guardianship or involuntary commitment proceedings on behalf of the victim as an incapacitated or incompetent person. And, after the victim was seized, the defendants actively concealed her whereabouts from police authorities, continued their unauthorized custody and deprogramming efforts, and moved the victim repeatedly to avoid governmental or other outside interference with their activities.

We conclude that the evidence proffered by defendants was legally insufficient to warrant its submission to the jury and that the trial court erred in ruling otherwise. Specifically, we conclude that the evidence was insufficient to support a rational belief that an imminent injury was threatened,

that an emergency existed because of any claimed impending injury, or that defendants' actions were reasonably necessary to avoid any demonstrable harm to the victim. *See People v. Patrick*, 541 P.2d 320 (Colo.App.1975) (not selected for official publication).

The prosecution also contends that the court erred as a matter of law in instructing the jury in accord with the pattern instruction suggested in *COLJI–Crim.* No. 7:08 (1990 Supp.). Because we have determined that the choice of evils defense was not properly placed in issue, we decline to address at length the form and sufficiency of the instruction given by the court. We note, however, that the instruction given follows the statutory language and that, ordinarily, such instructions have been held proper. *See People v. Dago*, 179 Colo. 1, 497 P.2d 1261 (1972).

Accordingly, the trial court's ruling allowing the choice of evils defense evidence to be submitted to the jury is disapproved.

MARQUEZ, J., concurs.

DUBOFSKY, J., specially concurs.

Judge DUBOFSKY specially concurring.

I concur with the result reached here, but write separately concerning the difficult parent/child and religious aspects of this case.

In 1982, after the victim, then 23 years old, had completed a year of study in California, she was in the process of returning to her home in Sweden when she was befriended by members of the Unification Church and soon became a member of it. Thereafter, her parents unsuccessfully tried to persuade her to leave the church.

The evidence here indicated the Church aggressively seeks new members and is very assertive about inculcating its members with its values and ideas. Also, there is evidentiary support for defendants' claim that the Church dominates and controls the personal lives of its members, including the victim.

Many religions purport to be the one true religion and thus, the only way for a person to obtain salvation. The choice by a child of a religion different from that of the parents is viewed by some parents as a disastrous mistake by the child. Therefore, the estrangement of an adult child from the family in this way may cause extraordinary feeling of concern, loss, and anger.

Here, the Church was undoubtedly offensive to the parents, both because of its impact on their daughter and its unorthodox methods and beliefs. The parents suffered greatly both from losing their daughter and their worry about her situation. Such concern and anguish has, however, been experienced by generations of other parents whose children have not followed and accepted their secular and religious views. *See* L. Rosten, *Religions in America* (1963).

Until their children reach majority, parents have several legally imposed obligations. *See, e.g.*, §§ 14–5–103, 14–6–110, 14–6–101, C.R.S. (1987 Repl.Vol. 6B). With these responsibilities there is a right, within limits, to control the child and an opportunity to transmit religious and secular values from parent to child.

After their children reach majority, parents retain the right to persuade their adult children as to what they consider the proper religious and secular values, through discourse and other legally accepted methods. The parents, however, are not permitted to kidnap their adult children or otherwise illegally coerce them into changing their religion, lifestyle, or associates.

The freedoms of religion, speech, and association are protected against government control or influence by the First Amendment. *See Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). The right of an adult to choose a religion, friends, or lifestyle which significantly differs from his or her parents' is an integral part of a free society. *See Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). The right to pursue these objectives is protected through the enforcement of our criminal and civil laws. *See* Note, *Cults, Depro-*

grammers, and the Necessity Defense, 80 Mich.L.Rev. 271 (1981).

Religions often command great allegiance from their followers. To people who stand outside the religion, the demand for this allegiance can appear domineering and destructive. Indeed, the evidence here, if believed, indicates the victim may have been controlled and directed to an extreme degree by the seemingly unorthodox practices of the Church. The right, however, of this adult woman to make her own decisions about religion and lifestyle far outweighs her parents' claimed right to protect her from the folly of her ways.

It is possible that in certain extreme cases, religious and secular practices would be so imminently destructive to an adult individual that the choice of evils instruction would be viable for a defendant who committed criminal acts in attempting to save such person. For example, under appropriate factual circumstances, a religion that practices human sacrifice or which physically restrains or assaults its members might well warrant intervention that would be ostensibly criminal in nature.

The evidence in this case, however, does not create a picture of such imminent physical or severe mental harm. *But see Peterson v. Sorlien,* 299 N.W.2d 123 (Minn. 1980), *cert. denied,* 450 U.S. 1031, 101 S.Ct. 1742, 68 L.Ed.2d 227 (1981). Indeed, there is some evidence suggesting that, for some individuals, membership in a "cult" is psychologically beneficial, whereas deprogramming is harmful. *See* Note, *Cults, Deprogrammers, and the Necessity Defense,* 80 Mich.L.Rev. 271 (1981).

I, therefore, agree with the majority's conclusion that, here, there was not, as a matter of law, sufficient evidence of imminent physical or severe psychological harm to justify this kidnapping.

Furthermore, if the choice of evils defense is permitted in cases such as the one at issue, the degree of religious orthodoxy will become a major aspect of the trial. Kidnapping charges should not be resolved by a jury on such a basis.

Excessive judicial inquiry into religious beliefs may itself constrain religious liberty. *Thomas v. Review Board,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *see also United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). A choice of evils defense, thus, should not be used as a vehicle to legitimize, in part, parental efforts to regain control over their adult children.

Although I agree with much of the reasoning and the conclusion reached by the majority I take exception to one part of the opinion. The majority states:

"However, the common law necessity defense is not available as an instrument for jury nullification of unpopular laws or for jury condonation of crimes committed against persons who espouse or adhere to unorthodox or unpopular causes that pose no threat of immediate injury."

Since this statement is not necessary to the holding of this case, it is dicta. Furthermore, in my view, the application of the choice of evils statute to other circumstances, including "unjust causes," should be considered by us only when it is the focus of specific factual circumstances.

Although not referenced in the majority opinion, in my view, the victim's rights of freedom of religion, association, and speech are important implicit factors underlying this decision. The extreme nature of the offense, *i.e.,* kidnapping, is also of significance. Furthermore, the facts here do not demonstrate an emergency situation in which injury was imminent. A case without these countervailing factors might result in a different conclusion as to the applicability of the choice of evils statute. Thus, the applicability of the choice of evils statute to a particular case depends on the social, political, and factual circumstance that underlie it.