**The PEOPLE of the State of Colorado, Plaintiff–Appellant,**

v.

**Donna YAKLICH, Defendant–Appellee.**

**No. 88CA1369.**

Colorado Court of Appeals,
Div. IV.

Nov. 21, 1991.

Rehearing Denied Jan. 9, 1992.

Certiorari Denied Aug. 10, 1992.

G.F. Sandstrom, Jr., Dist. Atty., James S. Whitmire, Asst. Dist. Atty., Pueblo, for plaintiff-appellant.

Law Office of Stanley H. Marks & Richard A. Hostetler, Richard A. Hostetler, Denver, for defendant-appellee.

Opinion by Judge ROTHENBERG.

In this appeal, the People challenge the propriety of several rulings made by the trial court during the jury trial of defendant, Donna Yaklich, for the murder of her husband. We disapprove two of the trial court's rulings and, in view of this, we find the People's other arguments moot.

On December 12, 1985, Charles and Eddie Greenwell shot and killed Yaklich's husband in the driveway of his home as he stepped out of his truck. Yaklich was inside the house asleep.

After her husband's death, Yaklich received payment under his three life insurance policies, and she admitted that she paid the Greenwells $4,200 in several installments for murdering her husband. Consequently, she was brought to trial on a charge of first degree murder and conspiracy to murder under a theory that she had been motivated to arrange her husband's death in order to obtain the insurance money.

The defense, however, maintained that Yaklich suffered from the "battered woman syndrome" and that her actions were justifiable acts of self-defense and were committed under duress resulting from years of physical and psychological battering by her husband.

According to the defense, Yaklich lived in a constant state of fear of her husband, and, at the time of his death, she believed she was in imminent danger of being killed by him or receiving great bodily injury from him. The defense also contended that Yaklich believed and had reasonable grounds to believe that there was a real or apparent necessity to act to avoid the imminent danger of death or great bodily injury.

The defense presented expert and other testimony in support of its battered woman theory. In contrast, the People's expert witness gave her opinion that Donna Yaklich did not fit the profile of a battered woman.

At the close of the evidence, over the People's objections, the trial court instructed the jury on Yaklich's affirmative defenses of self-defense and duress. It also gave the jury definitions of "imminent danger," "apparent necessity," and "reasonable belief." The jury acquitted Yaklich of murder in the first degree. However, it convicted her of conspiracy to commit murder in the first degree, and the court sentenced her to forty years in prison.

The central issue on appeal is whether a woman who has hired a third party to kill her abuser but who presents evidence that she suffered from the battered woman syndrome is entitled to a self-defense instruction. We hold that a self-defense instruction is not available in a contract-for-hire situation, even though the accused presents credible evidence that she is a victim of the battered woman syndrome. Accordingly, we disapprove the trial court's ruling on that issue.

## I.

The General Assembly has codified the law of self-defense at § 18-1-704, C.R.S. (1986 Repl.Vol. 8B). That statute permits an individual to use deadly physical force against another if the individual using deadly force reasonably believes that the other individual has used or imminently will use unlawful life-threatening force. *See Hare v. People,* 800 P.2d 1317 (Colo. 1990).

"Imminent" has not been expressly defined by statute or by Colorado case law in the context of self-defense. *Cf. People v. Brandyberry,* 812 P.2d 674 (Colo.App.1990) (in choice of evils context, "imminent" means "near at hand, impending or on the point of happening"). However, self-defense instructions are usually allowed when an accused has been faced with a threat of great bodily injury or death contemporaneously with the killing. *See Hare v. People, supra* (instruction on self-defense proper where victim shot while he and defendant struggled over gun); *Beckett v. People,* 800 P.2d 74 (Colo.1990) (self-defense instruction proper where victim followed defendant to defendant's car after

an argument, and the defendant reached into his car and pulled out a gun because he was afraid the victim would harm him); *People v. Jones,* 675 P.2d 9 (Colo.1984) (self-defense instruction proper where victim hit defendant first).

Yaklich contends that in the context of a battered woman situation in which the woman kills her abuser, "imminent" should be defined as: "likely to happen without delay, threatening, menacing, or impending, not immediate." Thus, according to Yaklich, a woman who kills her abuser or, as here, who hires another to kill her abuser is nevertheless entitled to a self-defense instruction even though she was not threatened with harm contemporaneously with the killing.

This is a case of first impression in Colorado, and in order to analyze and evaluate Yaklich's contention properly, it is necessary to examine briefly the battered woman syndrome as it relates to the issue of self-defense in Colorado.

## II.

The "battered woman syndrome" constitutes a series of common characteristics that appear in women who are physically and psychologically abused over an extended period of time by the dominant male figure in their lives. (Although in rare circumstances, the victim of "battered woman syndrome" may be a male, the literature suggests that the vast majority of victims are women). *See* L. Walker, *The Battered Woman* (1979) (The phrase "battered woman syndrome" was originated by Dr. Walker). *See also* Eber, *The Battered Wife's Dilemma: To Kill Or To Be Killed,* 32 Hastings L.J. 895 (1981); D. Martin, *Battered Wives* (1976); *State v. Kelly,* 97 N.J. 178, 478 A.2d 364 (1984).

Numerous cases across the country have held that the battered woman syndrome is "a recognized phenomenon in the psychiatric profession and is defined as a technical term of art in professional diagnostic textbooks." *State v. Allery,* 101 Wash.2d 591, 682 P.2d 312 (1984); *see State v. Norman,* 324 N.C. 253, 378 S.E.2d 8 (1989).

Studies in this area have revealed that in a battering relationship, violence does not occur all the time. Rather, there is a "cycle of violence" which has three phases: (1) a tension building phase; (2) an acute battering phase; and (3) a tranquil and loving phase. The cycle of violence is continually repeated until the victim becomes unable to predict her own safety or the effect that her behavior will have on the abuser. As a result, the woman is reduced to a state of learned helplessness. L. Walker, *The Battered Woman* (1979); L. Walker, *Terrifying Love: Why Battered Women Kill and How Society Responds* (1989).

According to the testimony, one very important and often misunderstood aspect of the battered woman syndrome is the fact that many battered women cannot safely leave their abusive mates. *See* Eber, *The Battered Wife's Dilemma: To Kill or To Be Killed*, *supra*. In fact, abuse often escalates at the time of separation, and it is then that battered women face the greatest danger of being murdered. Many abusers have been known to pursue the women who leave them and subject them to brutal attacks.

Additionally, battered women may not psychologically or emotionally have the alternative of leaving the abuser because of their low self-esteem, their emotional and economic dependency, the absence of another place to go, and the woman's legitimate fear of the abuser's response to her leaving. Thus, according to the expert testimony, battered women become trapped in their own fear and often feel that their only recourse is to kill the batterer or be killed. *See* Brewer, *Missouri's New Law on Battered Spouse Syndrome: A Moral Victory, A Partial Solution*, 33 St. Louis U.L.J. 227 at 231 (1988). *See also State v. Hundley*, 236 Kan. 461, 693 P.2d 475 (1985) ("This is a textbook case of the battered wife, which is psychologically similar to hostage and prisoner of war cases.").

■ The battered woman syndrome is not in itself a defense to the charge of assault or murder, that is, the existence of the syndrome does not of itself establish the legal right of a woman to kill her abuser. Rather, evidence of the battered woman syndrome may, in certain circumstances, be considered in the context of self-defense. *See State v. Leidholm*, 334 N.W.2d 811 (N.D.1983). In Crocker, *The Meaning Of Equality for Battered Women Who Kill Men In Self Defense*, 8 Harv. Women's L.J. 121, 132–33 (1985), the author explains:

Lay witnesses may establish the history of threats and physical abuse experienced by the defendant. In situations where the uninformed juror would not see any threat or impending danger, expert witnesses help elucidate how a battering relationship generates different perspectives of danger, imminence, and necessary force.

Expert testimony also attacks unstated stereotypic assumptions by explaining why the defendant stayed in the relationship, why she never sought help from police or friends, or why she feared increased violence.... [J]urors on their own or encouraged by the prosecution, may assume that the defendant stayed in the abusive relationship because the abuse was not serious or because she enjoyed it. Expert testimony demonstrates that women stay most often because they cannot or are afraid to leave.

### III.

In the reported cases where battered women have killed their abusers and have contended that they acted in self-defense, one of three scenarios is generally present: (1) the battered woman has killed her abuser at the time he was attacking her; (2) the battered woman has killed her abuser during a lull in the violence (such as while the abuser was sleeping); and (3) the battered woman has hired a third party to kill her abuser.

### A.

In situations in which the battered woman has killed her abuser at the moment of attack, virtually all jurisdictions have held that the woman is entitled to a self-defense instruction. *See, e.g., State v. Hundley, supra.*

## B.

In situations in which the woman has killed her abuser during a lull in the violence, there is a split of authority on whether she is entitled to a self-defense instruction. A key factor in the resolution of the issue has been the manner in which the particular jurisdiction defines "imminent danger."

Jurisdictions which define imminent danger as *immediate* danger have generally refused to allow a self-defense instruction to a defendant in this battered woman situation. *See People v. Aris*, 215 Cal.App.3d. 1178, 264 Cal.Rptr. 167 (1989) (self-defense instruction not justified because battered wife was not facing immediate peril when she shot and killed sleeping husband); *State v. Norman, supra* (self-defense instruction refused where wife shot and killed sleeping husband because, at the time of the killing, wife was not confronted with an instantaneous choice between killing husband and being killed); *State v. Stewart*, 243 Kan. 639, 763 P.2d 572 (1988) (self-defense instruction refused where wife shot sleeping husband because there was no lethal threat to wife contemporaneous with the killing).

Other jurisdictions have defined "imminent danger" to mean something other than immediate danger and have held that a battered woman who kills her abuser during a lull in the violence is entitled to a self-defense instruction. *See State v. Gallegos*, 104 N.M. 247, 719 P.2d 1268 (1986) (woman who shot and stabbed husband while he was lying in bed was entitled to self-defense instruction); *State v. Allery, supra* (self-defense instruction proper where battered wife shot husband while he was lying on couch, despite absence of any violent act immediately preceding shooting); *State v. Leidholm, supra* (self-defense instruction justified where battered woman stabbed husband while he slept).

No Colorado case has yet decided this issue.

## C.

We are aware of only three reported cases that discuss the issue of whether to give a self-defense instruction under circumstances in which the battered women have hired third parties to kill their abusers. Two arose in the state of Missouri and one arose in the state of Tennessee.

In *State v. Anderson*, 785 S.W.2d 596 (Mo.App.1990), a wife hired several men to kill her abusive husband. At her trial for murder, the court refused to allow her expert to testify that she suffered from the battered woman syndrome. On appeal, she contended that the trial court erred in refusing to allow her to present expert testimony supporting her self-defense claim and in refusing to instruct the jury on self-defense.

The Missouri Court of Appeals rejected her arguments and stated:

[T]he facts of the killing here do not support a self-defense claim or use of the battered spouse syndrome. [Defendant] hired or lured the killers into the crime. There was no evidence of self-defense of assaults of the husband *when he was shot.* [Defendant] had been talking for over three months prior to the murder about how to have her husband killed, with payment to the assailants out of his insurance proceeds. (emphasis added)

The Missouri court concluded that the woman did not prove she was in immediate danger at the time her husband was killed and, thus, failed to make a *prima facie* showing of self-defense. *See also State v. Martin*, 666 S.W.2d 895 (Mo.App.1984) (no error in excluding evidence of battered spouse syndrome where wife hired hit man to kill her abusive husband but failed to show she was in immediate danger at the time he was killed); Mo.Rev.Stat. § 563.033 (Supp.1988); *State v. Leaphart*, 673 S.W.2d 870 (Tenn.Crim.App.1983) (no error in trial court's failure to give a self-defense instruction where wife was not in immediate danger at time husband was killed by hired killers). *See generally* Brewer, 33 St. Louis L.J., *supra.*

## IV.

In summary, Yaklich contends that when a murder defendant presents evi-

dence that she meets the criteria of being a battered woman and raises self-defense as her theory of the case, she is then entitled to a self-defense instruction. She further contends that "imminent" danger is not limited to immediate danger but should be defined more broadly as: "likely to happen without delay, impending, [but] not immediate." Thus, according to Yaklich, the trial court properly instructed the jury.

However, even if we were to adopt Yaklich's definition of imminent, we still would not agree that a self-defense instruction is available in a contract-for-hire case for three reasons. First, to our knowledge, no jurisdiction in the country has held that a battered woman is entitled to a self-defense instruction in a murder-for-hire case, no matter how the jurisdiction has defined imminent.

Secondly, a self-defense instruction in a murder-for-hire situation would undermine ancient notions of self-defense which originated in the common law and were later codified in Colorado law. *See* § 18–1–704. As the North Carolina Supreme Court has stated: "The killing of another human being is the most extreme recourse to our inherent right of self-preservation and can be justified in law only by the utmost real or apparent necessity brought about by the decedent...." *State v. Norman, supra.*

Finally, we cannot overlook the fact that Yaklich's participation in the death of her husband was not merely peripheral. Had it not been for Yaklich, the Greenwells would not have been involved in this murder. Thus, in our view, we would be establishing poor public policy if Yaklich were to escape punishment by virtue of an unprecedented application of self-defense while the Greenwells were convicted of murder.

We recognize that the alternatives available to battered women have proven "tragically inadequate" in many cases, *People v. Aris, supra,* and in reaching this conclusion, we do not minimize the dangers that battered women face. Nevertheless, we conclude that the result reached reasonably balances an individual's inherent and time honored right of self-preservation with the great value our society places on human life.

Here, the uncontroverted evidence was that Yaklich approached several people about having her husband killed and that she met with Eddie Greenwell several times over an eight-month period. She paid the Greenwells after they killed her husband, and, at the time the contract killing was performed by the Greenwells, she was in her house sleeping.

We therefore hold that under either the People's or Yaklich's definition of "imminent," Yaklich's evidence, even if taken as true, was insufficient as a matter of law to support her theory that she was in imminent danger at the time her husband was killed. Therefore, the trial court erred in giving a self-defense instruction to the jury. *See People v. Banks,* 804 P.2d 203 (Colo.App.1990) (a defendant is entitled to an instruction embodying her theory of the case only if there is some evidence to support it). *See also People v. Garcia,* 690 P.2d 869 (Colo.App.1984).

In light of this conclusion, we need not address the People's additional contention that the trial court improperly instructed the jury on the definitions of "imminent danger," "apparent necessity," or "reasonable belief."

V.

The People next contend that the trial court erred in submitting an instruction to the jury on the affirmative defense of duress because Yaklich did not act "at the direction of another person" when she hired the Greenwells to kill her husband. Again we agree.

At the time Yaklich's husband was killed, the duress statute did not require a person to act "at the direction of another person" in order to establish the defense of duress. *See* § 18–1–708, C.R.S. (1986 Repl.Vol. 8B). Nevertheless, the case law required such a condition to exist. *See People v. Maes,* 41 Colo.App. 75, 583 P.2d 942 (1978).

Here, since there was no testimony that Yaklich acted "at the direction of another person," we disapprove the trial court's ruling giving a duress instruction.

## VI.

Finally, the People contend that the trial court erred by allowing defense counsel in his opening statement to refer to evidence relating to the battered woman syndrome, to self-defense, to Yaklich's husband's reputation for violence, and to his use of steroids; and that the court further erred in allowing the cross-examination of prosecution witnesses and the presentation of defense witnesses regarding these matters. However, in view of our rulings above, these contentions are moot.

The trial court's rulings allowing a self-defense instruction and a duress instruction are disapproved.

STERNBERG, C.J., and HUME, J., concur.