Greene, J.
which McDonald and Getty, JJ., join.
Respectfully, I dissent.
The Majority Opinion expands the doctrine of self-defense beyond the limits of immediacy and necessity in concluding that a criminal defendant who was charged with the crimes of solicitation, conspiracy, and first degree premeditated murder after arranging for a third party to kill her husband was entitled to a jury instruction on imperfect self-defense. Even if a battered spouse has a subjective belief that death or serious bodily harm at the hands of her abuser is inevitable, a murder planned weeks or months in advance can at most be considered a response to a generalized threat or expected future threat, but not a response to an imminent or immediate threat. In other words, even if the battered spouse syndrome can show that the spouse has a generalized fear, the syndrome cannot substitute for the requirement of an imminent or immediate threat for imperfect self-defense.
The Court of Special Appeals determined that there was no specific evidence that Ms. Porter, at the time of the murder of her husband, believed that she was in imminent danger of death or serious bodily harm. I agree with the intermediate appellate court that Ms. Porter failed to generate “some evidence” that at the moment the hired killer, Mr. Bishop, fired the fatal shot into Mr. Porter that she (Ms. Porter) subjectively believed that she was in imminent or immediate danger of death or serious bodily harm. Furthermore, Mary *257 land Code (1991, 2013 Repl. Vol.), § 10-916 of the Courts and Judicial Proceedings Article (“CJP”) does not expand the contours of the self-defense doctrine by weakening or eliminating the requirement that the defendant act in response to an imminent or immediate threat. And, as all of our sister jurisdictions to examine the issue have held, a spouse who enters into contracts with third parties to kill an alleged abuser may believe death at the hands of her abuser is inevitable; the defendant is not acting in response to an imminent threat, and consequently should not receive a self-defense instruction. Accordingly, Ms. Porter was not entitled to a jury instruction on imperfect self-defense.[1]
A. The Imminent or Immediate Requirement for Imperfect Self-Defense
We held in State v. Faulkner, 301 Md. 482, 483 A.2d 759 (1984) that “the honest but unreasonable belief standard of imperfect self-defense” is not a complete defense because it “mitigates murder to voluntary manslaughter.” Id. at 486-500, 483 A.2d at 761-68. Our opinion in Dykes v. State, 319 Md. 206, 571 A.2d 1251 (1990) provided the following explanation:
It is clear from our Faulkner [decision] that when evidence is presented showing the defendant’s subjective belief that the use of force was necessary to prevent imminent death or serious bodily harm, the defendant is entitled to a proper instruction on imperfect self-defense.... [Thus,] the defendant has the burden of initially producing some evidence on the issue of mitigation or self-defense [to entitle him or her to a jury instruction]. Once the issúe has been generated by thé evidence, however, the State must carry the ultimate burden of persuasion beyond a reasonable doubt on that issue.... [Some evidence is defined as] any evidence relied on by the defendant which, if believed, would support his *258 claim that he acted in self-defense, the defendant has met his [or her] burden. Then the baton is passed to the State. It must shoulder the burden of proving beyond a reasonable doubt to the satisfaction of the jury that the defendant did not kill in self-defense.
Dykes, 319 Md. at 215, 217, 571 A.2d at 1256-57 (internal citations and quotation marks omitted).
We explained in State v. Smullen, 380 Md. 233, 250-51, 844 A.2d 429, 439 (2004), among other things, that the battered spouse syndrome statute permits the jury to analyze the elements of self-defense in a more sophisticated way. When the syndrome is “applied in a proper setting, [it] can thus, depending on the circumstances, support both the subjective honesty of the defendant’s perception of imminent harm and the objective reasonableness of such a perception.” Id. at 251, 844 A.2d at 439. However, as the State noted in its brief, the Smullen Court “did not relax the requirement of the self-defense doctrine[which is,] that the defendant believe that [he or] she was in immediate and imminent danger.” We explained that it is the defendant’s burden to produce “some evidence” that, “in light of that pattern of abuse, the defendant could honestly, and perhaps reasonably, perceive an imminent threat of immediate danger.” Id. at 273, 844 A.2d at 453.
Mr. Smullen’s self-defense was based upon a claim of battered child syndrome. Id. at 238, 844 A.2d at 431. As his adoptive father sat on the couch reading a newspaper, Mr. Smullen snuck up behind his father and killed him by stabbing and cutting him repeatedly with a butcher knife. Id. at 240, 844 A.2d at 433. We affirmed the trial court’s exclusion of Mr. Smullen’s claim of past abuse, psychiatric testimony and hearsay statements about alleged past abuse. Id. at 238, 844 A.2d at 432. In reversing the judgment of the Court of Special Appeals we explained:
The panel majority ... effectively repealed] the well-established requirement of self-defense that there be some contemporaneous overt act or threat by the victim, sufficient to instill in the defendant an honest, even if unreasonable and *259 erroneous, subjective belief of imminent death or serious bodily injury that required the deadly response undertaken by the defendant. It equated the statutory application of the battered spouse syndrome doctrine, notwithstanding evidence that the defendant was the “first aggressor,” with the notion that the doctrine, as to both spouses and children, applied as well when there was no contemporaneous act or threat which even the defendant regarded as presenting an imminent danger of harm.
Id. at 250, 844 A.2d at 439 (emphasis added).
Thus, I agree with the State that one of the lessons of Smullen is that the kind of generalized fear that Ms. Porter had in response to a threat days before did not generate the issue of self-defense. In other words, as the State argued, to generate the issue of self-defense, the defendant must present “some evidence that she perceived a contemporaneous danger of severe bodily injury or death in response to a warning sign that she perceived as a threat or overtly hostile act by the victim.”
Our case law has established that the requisite state of mind for imperfect self-defense is that the “fear must be of imminent death or serious bodily injury.” State v. Martin, 329 Md. 351, 365 n.6, 619 A.2d 992, 999 n.6 (1993). As the Majority Opinion concedes, our case law has not defined “immediate” or “imminent.” The ordinary meaning of “immediate” includes: “occurring without delay[.]” Immediate definition, Black’s Law Dictionary (10th ed. 2014). The ordinary meaning of “imminent” is “[ajbout to occur at any moment[.]” Imminent definition, Webster’s II New College Dictionary (3d ed. 2005).
The Majority Opinion gives the term “imminent” an all-encompassing meaning. Contrary to the Majority’s holding in this case, evidence as to the battered spouse syndrome cannot be used to show that a battered spouse felt that he or she was under an imminent or immediate threat of death or serious bodily harm at all times. In doing so, the Court relaxes the requirement of real or apparent necessity as the traditional *260 basis for justification of homicide. “Such reasoning proposes justifying the taking of human life not upon the reasonable belief [that] it is necessary to prevent death or great bodily harm—which the imminence requirement ensures—but upon purely subjective speculation that the decedent probably would present a threat to life at a future time and that the defendant would not be able to avoid the predicted threat.” State v. Norman, 824 N.C. 253, 378 S.E.2d 8, 15 (1989) (A broad and indefinite interpretation of the word “imminent” results in a subjective speculation that the decedent will probably pose a threat in the future and “weaken[s the law’s] assurances that justification for the taking of human life remains firmly rooted in real or apparent necessity.”). For example, in the present case, without the requirement of imminency, the danger exists that a jury could find that imperfect self-defense applies not because the defendant acted out of an excusable belief that her actions were necessary to protect herself, but simply because the jury sympathizes with the defendant’s history of receiving abuse at the hands of the man she killed. That is not and cannot be the law—however much a jury may sympathize with the defendant, and however much the jury may feel the victim has acted in a morally repugnant manner, such impressions cannot be permitted to justify the greatest and most permanent crime, the taking of another’s life.
Moreover, the result of the Majority opinion contravenes the intent of our Legislature when it enacted CJP § 10-916. That statute provides that a court has discretion to admit evidence as to the battered spouse syndrome:
Admissibility of evidence.—Notwithstanding evidence that the defendant was the first aggressor, used excessive force, or failed to retreat at the time of the alleged offense, when the defendant raises the issue that the defendant was, at the time of the alleged offense, suffering from the Battered Spouse Syndrome ... the court may admit for the purpose of explaining the defendant’s motive or state of mind, or both, at the time of the commission of the alleged offense:
*261 (1) Evidence of repeated physical and psychological abuse of the defendant perpetrated by [the victim of the defendant’s alleged crime]; and
(2) Expert testimony on the Battered Spouse Syndrome.
§ 10-916(b) (emphasis added).
Section 10-916 originated as House Bill 49 and Senate Bill 141 in 1991. The bill file contains a Floor Report associated with House Bill 49 recognizing that “[tjhis bill would clarify that the court has discretion to admit evidence of repeated physical and psychological abuse of the defendant by the alleged victim and expert testimony on the battered spouse syndrome.” Floor Report, Bill File, H.B. 49 (Md. 1991). The bill, in fact, underwent substantive changes to guarantee that the statute was permissive and discretionary. Drafts of House Bill 49 show the striking of mandatory language such as the word “requiring” as well as the words “a court shall admit such evidence” from its initial version; the mandatory language was replaced with discretionary language in the current version, which provides that “the court may admit” such evidence.
The bill file contains other evidence that the Legislature did not intend for the statute to apply in all spousal murders. A letter from the House of Ruth, for example, addressed to the House Judiciary Committee, explained the effect of the House Bill 49 in a section titled “Myths About HB 49”:
MYTH #1: THIS BILL TIES THE HANDS OF THE TRIAL COURT.
House Bill 49 does NOT require the court to admit this evidence in every case. This bill has been purposefully written in permissive language (“the court may admit evidence”) in order to allow the court the broadest latitude possible to control the conduct of a trial without restricting the defendant’s constitutional right to a full and fair hearing.
MYTH #2: THIS BILL IS A “LICENSE TO KILL”
This bill is NOT a license to kill any more than current ' self defense law promotes killing. This bill only permits a *262 defendant to explain why he or she thought it reasonable to act as they did on a particular occasion.
* ‡ *
MYTH #4: THE BATTERED SPOUSE SYNDROME WILL BECOME A NEW DEFENSE TO MURDER.
This myth completely misunderstands the law of self defense and imperfect self defense. Evidence of the Battered Spouse Syndrome is offered in support of the state of mind element of perfect and imperfect self defense—in other words, it is offered to prove the honesty and reasonableness of the defendant’s belief he or she was in imminent danger at the time of the offense.
⅜ * *
The bill is permissive, rather than mandatory, allowing ample room for the trial court to exclude evidence which is clearly irrelevant or too distant in time to support the defendant’s claim.
Letter to House Judiciary Committee, Bill File, H.B. 49 (Md. 1991) (emphasis added). The Legislature could not have intended—and did not intend—for the battered spouse syndrome evidence to generate a perfect or imperfect self-defense jury instruction when there is no evidence of an imminent or immediate risk of harm to the defendant.
In the present case, Ms. Porter did not present evidence that her husband was the aggressor and that, at the time and place of the shooting, Ms. Porter felt herself in imminent danger of death or serious bodily injury. Ms. Porter did not testify that at the particular time of the shooting at the gas station she had a specific fear of death or serious bodily harm. Thus, in Ms. Porter’s case there was a crucial evidentiary gap as to the state of mind element for imperfect self-defense, namely, that she subjectively felt herself under imminent or immediate threat of death or serious bodily harm. The evidence which Ms. Porter submitted to show that she was a battered spouse could legitimately have been considered by the jury to explain why Ms. Porter was reluctant to seek help prior to the killing, or to show that certain behavior on the *263 part of Mr. Porter which an ordinary person would not perceive as imminently threatening was subjectively so to Ms. Porter. But, contrary to the Majority’s position, it is not the kind of evidence that could replace the total lack of evidence that Ms. Porter subjectively believed that she was in imminent or immediate danger at the time of the killing. The evidence of threatening or abusive behavior by Mr. Porter days or weeks before the killing, and of Ms. Porter’s subjective belief that she faced a general or looming threat from Mr. Porter is simply not enough on its own to show that, at the moment of the killing, she subjectively believed that there was an imminent threat and that she needed to respond to defend herself.
B. Contract Killing
Furthermore, the events of this case fall squarely into the category of “contract killing,”[2] in which “courts have unanimously refused to permit instructions to the jury on self-defense claims.” John W. Roberts, Between the Heat of Passion and Cold Blood: Battered Woman’s Syndrome As an Excuse for Self-Defense in Non-Confrontational Homicides, 27 Law & Psychol, Rev. 135, 145 (2003).
In People v. Yaklich, Mrs. Yaklich hired Charles and Eddie Greenwell to kill her husband; she was asleep in the family home when the Greenwells killed Mr. Yaklich in the family’s driveway. The Colorado Court of Appeals did “not agree that a self-defense instruction [was] available in a contract-for-hire case for three reasons.” People v. Yaklich, 833 P.2d 758, 763 (Colo. App. 1991). Firstly, no other jurisdiction in the country allowed such an instruction for battered women in a murder-for-hire contract, “no matter how the jurisdiction has defined imminent.” Id. “Secondly, a self-defense instruction in a murder-for-hire situation would undermine ancient notions of self-defense which originated in the common law.” Id. And, lastly, *264 allowing such an instruction would serve as poor public policy. The Court indicated that it would be unfair for the Greenwells to be convicted of murder, while Mrs. Yaklich would receive a lesser sentence, “escap[ing] punishment by virtue of an unprecedented application of self-defense[,]” despite the fact that she was the one who sought out the Greenwells and were it not for her they would not be involved in the murder. Id. Ultimately, “Yaklieh’s evidence, even if taken as true, was insufficient as a matter of law to support her theory that she was in imminent danger at the time her husband was killed. Therefore, the trial court erred in giving a self-defense instruction to the jury.” Id. The Court concluded that “the result reached reasonably balances an individual’s inherent and time honored right of self-preservation with the great value our society places on human life.” Id.
The Missouri Court of Appeals also refused to allow a self-defense instruction due to the lack of imminency in a “murder-for-hire” case:
[T]he facts of the killing here do not support a self-defense claim or use of the battered spouse syndrome. [Defendant] hired or lured the killers into the crime. There was no evidence of self-defense of assaults of the husband when he was shot. [Defendant] had been talking for over three months prior to the murder about how to have her husband killed, with payment to the assailants out of his insurance proceeds.
State v. Anderson, 785 S.W.2d 596, 600 (Mo. Ct. App. 1990) (holding that the defendant did not prove she was in immediate danger at the time of the killing and, thus, failed to make a prima facie showing of self-defense); see also State v. Leaphart, 673 S.W.2d 870, 873 (Tenn. Crim. App. 1983) (holding the lower court was correct in failing to provide a self-defense instruction because the wife was not in imminent danger at the time her husband was killed by two men who she hired); State v. Martin, 666 S.W.2d 895 (Mo. App. 1984) (upholding the exclusion of the battered woman syndrome evidence where defendant hired a third party to kill her husband because the mere possibility that her husband would blow up their marital *265 home when she was in it did not create immediate danger at the time of killing). The Michigan Court of Appeals also found that self-defense is not available to battered women in a “gun-for-hire” situation because there is no imminent danger. People v. Varner, No. 224865, 2002 WL 741531, at *1 (Mich. Ct. App. Apr. 23, 2002) (“Self-defense in Michigan requires a finding that the defendant’s actions were justified because she honestly and reasonably believed that her life was in imminent danger or that there is a threat of serious bodily harm.... A person may use deadly force in self-defense to repel a criminal sexual assault when confronted with force that the person reasonably believes could result in imminent death or serious bodily harm, but self-defense is not available to repel a potential force.”); see also Varner v. Stovall, 500 F.3d 491, 500 (6th Cir. 2007) (“The Michigan courts acted reasonably when they held that Varner, in hiring a contract killer, did not ‘act out of passion’... Whether it is a question of self-defense or a question of provocation, Varner fails to explain why an individual who faces a nonimminent threat is not just as capable of calling the authorities as of hiring a contract killer.”). The Ohio intermediate appellate court ruled similarly:
[Alppellant had several conversations on different days concerning her wish to have her husband murdered. This type of planning dispels the notion that appellant was in the sort of imminent danger of harm that justifies the use of deadly force. Because the evidence in the record indicates that appellant was not entitled to the affirmative defense of self-defense, counsel’s failure to introduce evidence that appellant was suffering from battered woman syndrome did not deprive appellant of her right to effective assistance of counsel.
State v. Fink, No. CA94-10-009, 1995 WL 447791, at *2 (Ohio Ct. App. July 31, 1995).
Our sister jurisdictions have been clear that a contract killing scenario is incompatible with imperfect self-defense which requires that a defendant respond to an imminent or immediate threat. In all of the cases discussed above, as well as this case, the defendant planned the killing well in advance *266 with a hired confederate. During this advance planning period, it is at least possible that a defendant subjectively—although in most if not all of the cases plainly unreasonably—believed that killing her abuser was a necessary response to a perceived risk of death or serious bodily harm. But, as the planning period stretches into days, weeks, or even months, it would be strange that any defendant who was still in full possession of her faculties could possibly believe, even subjectively, that all her advance planning was to protect herself from an imminent or immediate threat. Rather, a defendant would at most be acting in response to prior threating incidents, or to a generalized state of fear that an abuser might harm her at an unspecified time in the future. Thus, contract killing is entirely distinct from the proper application of battered spouse syndrome evidence in an imperfect self-defense case, which is to show that behavior that might not be objectively imminently threatening was subjectively so the battered spouse, either because of her long familiarity with the abuser or because she could recognize that the behavior indicated the climax of a “cycle” of abuse.
Ms. Porter planned her husband’s murder weeks before it actually took place. After considering other prospects to hire, Ms. Porter settled on hiring Mr. Bishop and promised to pay him $400 towards his child support obligation for his services. Although there was evidence that Ms. Porter sustained abuse in the “week or so” before her husband’s murder, the planning of his killing started at least nine months earlier. Additionally, it was only after three attempts to secure Mr. Porter’s death that Ms. Porter connected with Mr. Bishop. Moreover, on the morning of the murder, she lured her husband to the gas station that they owned in order to carry out her plan; she met with Mr. Bishop at a McDonald’s prior to the staged robbery, and she accompanied Mr. Bishop into the gas station from a side door.
Taken together, these facts undermine Ms. Porter’s subjective belief that she was in imminent danger on the morning of March 1, 2010 and creates an attenuation too great to support the idea of an imminent threat to her life. I would adopt the *267 Court of Special Appeals’ position that Ms. Porter’s “active participation in an elaborate conspiracy to kill her husband places her outside of the class of persons for whose protection the Battered Spouse Statute was enacted.” Porter v. State, 230 Md.App. 288, 329, 148 A.3d 1, 25 (2016). Under the circumstances of this case, Ms. Porter’s planning of her husband’s demise dispels the notion that she was in the sort of imminent danger of serious bodily harm that justifies the use of deadly force. Where a third party was hired by the defendant to murder her husband, and thus there was no evidence that Ms. Porter, on the morning of the murder of her husband, believed that she was in imminent danger, she should not have been entitled to a jury instruction on imperfect self-defense.
C. Conclusion
For the above reasons, I would adopt the reasoning of the Court of Special Appeals and hold that Ms. Porter was not entitled to an imperfect self-defense instruction and, therefore, the trial court’s error in issuing an improper imperfect self-defense instruction was harmless. The Majority opinion takes an unprecedented pivot in the area of imperfect self-defense by relaxing the requirement of an imminent and immediate threat for a battered spouse. And, a defendant who hires a third party to murder her spouse, even if she is suffering from battered spouse syndrome, should not be entitled to a perfect or imperfect self-defense instruction. This is so because a contract killing by its nature is more consistent with an act of retaliation for past abuse. Thus, respectfully, I dissent.
Judges McDonald and Getty have authorized me to state that they join in this dissent.

. Ms. Porter was also charged with solicitation and conspiracy charges, but imperfect self-defense does not apply to the crimes of solicitation and conspiracy. See Jones v. State, 357 Md. 408, 422, 745 A.2d 396, 403 (2000) (“The doctrine of imperfect self-defense applies only to ‘criminal homicide and its shadow forms, such as attempted murder.’ ”).

. I limit my opinion to the subset of non-confrontational killings in which the battered spouse has hired someone to kill her alleged abuser; thus, I do not speculate as to the use of the battered spouse syndrome in other non-confrontational settings.