# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### April 19, 2011 Session

## STATE OF TENNESSEE v. DEREK WILLIAMSON

**Appeal from the Criminal Court for Sumner County**
**No. 621-2008     Dee David Gay, Judge**

---

**No. M2010-01067-CCA-R3-CD - Filed August 12, 2011**

---

A Sumner County jury convicted the Defendant, Derek Williamson, of first-degree premeditated murder, and he was sentenced to life imprisonment. On appeal, the Defendant argues that the trial court erred by commenting on possible sentencing options during voir dire, that the trial court erred by not granting a mistrial based on prejudicial testimony from a witness, that the trial court erred in allowing the testimony of the responding police officer about the appearance of evidence found at the scene, that the trial court abused its discretion by admitting two autopsy photographs, that the trial court improperly instructed the jury on flight, that the evidence was insufficient to sustain his conviction, that the trial court improperly denied his request for a self-defense instruction, and that he is entitled to a new trial because of cumulative error. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

DAVID H. WELLES, SP. J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

John Pellegrin, Gallatin, Tennessee, and James O. Martin, III, Nashville, Tennessee, for the appellant, Derek Williamson.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Lawrence W. Whitley, District Attorney General; and C. Ronald Blanton, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual Background

This case arises from the June 18, 2008 shooting death of Grady Carter ("the victim") in front of his house in Westmoreland. On August 8, 2008, a Sumner County grand jury indicted the Defendant for first-degree premeditated murder. The case proceeded to trial in July 2009.

The victim and Adrian Holmes began dating in 2001 and were parents to their son Peyton, who was born in 2005. The family lived together in the Ridgecrest Subdivision of Westmoreland, and they had an intimate group of friends in Westmoreland with whom they frequently socialized and traveled, including the Defendant. However, in August 2007, the relationship between the victim and Holmes ended. Holmes moved out of the family home into an apartment. By mutual agreement, she and the victim shared custody of Peyton, with his time split equally between them during the week and on weekends.

Later in the fall of 2007, Holmes began dating the Defendant, and in November of that year, he moved in with her. The victim was upset with this arrangement and with the relationship in general between Holmes and the Defendant. Though he never expressed to Holmes that he wanted to kill the Defendant, he often told her that he wanted to "kick his ass." The victim never physically harmed the Defendant, but over a period of months from November 2007 to April 2008, he often harangued the Defendant with text messages, in which he would call the Defendant profane names and tell him that he "[couldn't] hide forever; your day is coming." However, the text messages ceased in May 2008.

Three days prior to the shooting, the Defendant received some forwarded messages from the victim that Holmes had sent to him, in which she stated that she might be willing to put the family back together and that she was sorry for the problems she had caused the victim. One message also included a picture she had sent the victim of she and Peyton. Two days before the shooting, the Defendant and the victim met at a local bank, at the victim's suggestion, to discuss the messages from Holmes and what they actually meant. During the meeting, the victim asked the Defendant about his relationship with Holmes and whether they had been having problems. The victim told the Defendant that Holmes had been showing up more often at his house under the guise that she had forgotten something, or she stayed longer when dropping off or picking up Peyton. The Defendant admitted to the victim that he and Holmes had been having difficulties over her phone "and the way she had acted about her phone." The Defendant and the victim also discussed their relationship. The victim told the Defendant that "he was still pissed" and that he was never going to forget it or forgive him.

The day before the shooting, the Defendant and Holmes had a heated argument, which resulted in the Defendant's decision to move out of the apartment. Holmes told him that she did not want the relationship to end, but he felt she was not honest with him and was only telling him what he wanted to hear. He felt it would be best if they split up for a while. He did not, however, move out of the apartment.

On the afternoon of the shooting, Holmes and the Defendant talked about their plans for the evening. Holmes wanted to see a movie at the drive-in, but the Defendant wanted to have pizza and beer at home. Holmes obliged, and they spent the evening at home. Later, she received a video message from the victim of Peyton catching lightening bugs. The Defendant was in the room with her when she got the message and could hear Peyton's excited voice on the video. He asked her who had sent the message, and she told him that the victim had sent it. They then argued about the victim sending her video messages. Holmes expressed to the Defendant that it was entirely appropriate for she and the victim to have this kind of contact involving their son, particularly because they each only saw him part of the week, and the Defendant grabbed her phone from her and threw it across the room, shattering the screen. The Defendant then stormed down the hall to the bathroom, punching a hole in the wall on his way.

When the Defendant exited the bathroom, they argued more about the messaging between the victim and Holmes. Holmes then called the victim and asked him to talk to the Defendant about the nature of these messages. The victim told Holmes that he was going to keep sending these messages, and he did not care what the Defendant thought about it. The Defendant refused to speak to the victim. The victim then called the Defendant's cell phone, but he did not answer it. The victim left a voice mail, in which he told the Defendant that he could not get angry over anything the victim had done and that if the Defendant did not like it, "he would find [him] and he'd kick [his] ass."

The Defendant then stormed into the kitchen, picked up his loaded gun from the kitchen table, looked back at Holmes, and said, "I hope you're happy; you just got him killed." The Defendant subsequently took off in his car. Holmes tried to reach the Defendant on his cell phone, but he did not answer. She tried to call the victim, but his phone went directly to voice mail. She then reached the victim's cousin, Shawn Carter, who lived down the street from the victim, and told him that the Defendant was upset and headed to the neighborhood. She asked him to get Peyton out of the house. Holmes finally reached the victim and told him that the Defendant was upset and had a gun. She asked him to take Peyton and go to Shawn's house. He said that he would take Peyton but refused to leave his house.

After getting Holmes's call, Shawn Carter walked down the street to the victim's house to get Peyton, and he took Peyton back to his house to stay with his wife. He then walked back to the victim's house to make sure nothing happened, but he did not really believe the Defendant would show up. When he got there, the victim was outside on the phone, talking loud and cussing. Shawn and fellow neighbor, Beau Troutt, who had walked toward the victim's house because Shawn's wife had called him with concern, went over to Todd Rollin's house, who lived across the street. Rollin had come out of his garage, and the three of them talked briefly in Rollin's yard. Rollin told Shawn and Troutt that he did not want to be involved in any of this but to call him if they needed him. The victim then walked over to Shawn and Troutt and said that he had been waiting for this for a long time. He told them that he was going to kick the Defendant's ass if he got there. The victim had no weapon on his person or in his hand.

Several minutes later, the Defendant's car was heard coming around the corner. After he entered the subdivision, he pulled in front of the victim's driveway. The victim threw up his hands and said, "What's up?" The Defendant then opened his car door, pulled out a gun, and fired several shots at the victim. After the first few shots, the victim fell to the ground. Shawn Carter then ran to the Defendant's car, opened the passenger door, and yelled at him about what he was doing. The Defendant did not acknowledge him, put the car in reverse, and took off. Shawn pushed the car door shut with his foot as the Defendant sped away.

Westmoreland Police Sergeant Karl Haynie, who was a patrol officer at the time, was near the Ridgecrest subdivision on routine patrol when he heard what he thought were fireworks. He was already headed in that direction to check out the situation when he was dispatched to the scene for possible gunshots. Upon arriving at the scene, he found the victim lying on the road by a mailbox. Many people were around him, and he was curled up in the fetal position. Sergeant Haynie could see that the victim was bleeding profusely, particularly from his neck. He was told the victim's name and that the Defendant had driven up and shot him.

After calling for emergency services and Lifeflight, Sgt. Haynie secured the area and began collecting evidence from the scene. He found thirteen spent shell casings but no weapon. He took several pictures of the scene, including some pictures of the curb in front of the victim's house, which had two marks consistent with marks left by a bullet ricochet. Bullet fragments were also found near the victim on the ground and in the vicinity of the curb.

Westmoreland Chief of Police Deneise Etheridge also responded to the scene that evening. Paramedics were already attending to the victim upon her arrival, and she was debriefed by Sgt. Haynie. She helped Sgt. Haynie locate some of the shell casings, and upon

completing her inventory of the scene, she went to the victim's father's house to tell him that his son had passed away.

After leaving the scene, the Defendant drove around Sumner County for some time. During that time, Brandon Clark, an off-duty Sumner County Sheriff's Deputy and friend of both the Defendant and victim, called the Defendant on his cell phone. Clark had learned about the shooting from Holmes, and Clark was worried that the Defendant might harm himself. When he reached the Defendant, the Defendant essentially admitted that he had shot the victim. Clark told the Defendant that the victim was not dead and that, at this point, he could only be charged with aggravated assault. Clark urged the Defendant to turn himself in. However, the Defendant told him that "it would be a lot longer" because he was pretty sure the victim would die. He then told Clark that the shooting was premeditated.

Later that evening, Chief Etheridge and Sgt. Haynie were at the police department when they received a phone call from the Defendant's attorney advising that the Defendant was going to the Sumner County Sheriff's Office to turn himself in. They met the Defendant there with his mother and attorney and took him into custody for the murder of Grady Carter. During a discussion with the Defendant, he told them where he had tossed the weapon. The Defendant's attorney told them that the Defendant's car was in a hayfield behind the Defendant's mother's house.

Chief Etheridge later located the weapon about two-tenths of a mile from the victim's driveway. It was a Sig Sauer .40 caliber semi-automatic weapon capable of holding thirteen rounds between the clip and the chamber. She also located the Defendant's car, a silver Mustang, in a hayfield behind his mother's house. The hay was high and totally covered the car. As part of her investigation, Chief Etheridge also drove the distance from the Defendant's apartment to the victim's house and determined that it was thirteen miles. Driving the speed limit, it took her about twenty minutes.

Assistant Medical Examiner Dr. Thomas Deering performed the autopsy on the victim. Dr. Deering found seven separate gunshot wound paths on the victim's body. Three gunshots entered through the back of the victim's body on the left side and exited the front of the body. All of those shots hit a rib, broke it, and hit the left lung. These shots were fatal. The victim was also shot in the left side of the neck, striking his jaw behind the left upper molar. Additionally, the victim was shot twice in the back of the left arm. One shot exited the front of his left arm, and the other traveled through the arm and into his chest. The final gunshot wound was to the base of his thumb on his left hand. Grazing wounds were also present across his left hand. Dr. Deering determined that the victim was shot from at least two feet away. He determined the cause of death was multiple gunshot wounds and the manner of death was homicide.

# Analysis

## I. Instruction to Jury on Penalties

The Defendant contends that the trial court committed reversible error when it twice told prospective jurors during voir dire that the State was not seeking either the death penalty or the penalty of life without parole on the murder charge and that "should you find the Defendant guilty of first-degree murder in this case, there will be an automatic life sentence imposed." Though the Defendant failed to contemporaneously object to these comments, he contends that the trial court's comments entitle him to a mistrial. We disagree.

Tennessee Code Annotated section 40-35-201(b) provides:

In all contested criminal cases, except for capital crimes which are governed by the procedures contained in §§ 39-13-204 and 39-13-205, and as necessary to comply with the Constitution of Tennessee, article VI, section 14, and § 40-35-301, the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses.

During voir dire, the trial judge commented to the jury venire that

upon a trial for first-degree murder, should the jury find the Defendant guilty of first-degree murder, it shall not fix punishment as part of the verdict, but the jury shall fix the punishment in a separate sentence [sic] hearing to determine whether the Defendant shall be sentenced to death, to imprisonment for life without possibility of parole, or to imprisonment for life.

The trial court further commented that because the State was not seeking the death penalty in this case, "should you find the Defendant guilty of first-degree murder. . . there will be an automatic life sentence imposed." The Defendant did not object to these comments by the trial court.

Later, after the jury was selected, the court again commented that, "as we have told you, should you find the Defendant guilty of first-degree murder, there will be an automatic life sentence imposed. If you should find the Defendant guilty of a lesser included offense, it will be up to me to impose the penalty within the limits provided by the law." Again, the Defendant did not object to these comments.

In fact, the Defendant did not object to these remarks until the second day of trial, after several witnesses had testified for the State, at which point he argued for a mistrial under Tennessee Code Annotated section § 40-35-201(b).   The Defendant's failure to contemporaneously object to the comments of the trial court constitutes a waiver of the issue on appeal. See Tenn. R. App. P. 3(e) , 36(a) (stating "nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). State v. Kenneth Kisamore, No. M2010-01565-CCA-R3-CD, 2011 WL 2474061, at *3 (Tenn. Crim. App., Nashville, June 21, 2011) (defendant's failure to object to State's comments at trial about the sentence a witness received in exchange for his guilty plea on charges stemming from same case waived consideration of the issue on appeal).

Regardless, the issue is without merit.  Under the statute, the trial judge's remarks to the prospective jurors about the penalties for first-degree murder were error.  However, this Court has previously addressed this issue and found the trial court's error to be harmless.

Similar to the present case, the trial court in State v. Charles Ray Allen remarked to the jury venire that the State was not seeking the death penalty or life imprisonment without the possibility of parole, therefore, should the jury find the defendant guilty of first-degree murder, an automatic life-sentence would be imposed.  No. M1999-00818-CCA-R3-CD, 2000 WL 1649507, at *7 (Tenn. Crim. App., Nashville, Nov. 3, 2000). This Court determined that "the jury clearly rejected the Defendant's explanation [that he shot the victim out of fear, anger and self-defense], and the proof was more than sufficient to support the jury's conclusion." Id. at *8.  The Court found that there was absolutely no indication in the record that the jury would have convicted the Defendant of either of the lesser included offenses, or acquitted him, had the challenged information not been provided.  Id. Because the trial court's error in instructing the jury about the penalties for first-degree murder did not "affirmatively appear to have affected the result of the trial on the merits," Tennessee Rule of  Criminal Procedure 52(a), the Defendant was not entitled to a new trial on this ground.

Relatedly, in State v. Edward Pinchon, the defendant was tried for first-degree murder, and the trial court instructed the jury that the punishment for the charged offense was life imprisonment or life imprisonment without parole. No. M1999-00994-CCA-R3-CD, 2000 WL 284071, at *4 (Tenn. Crim. App., Nashville, Mar. 17, 2000). The court further informed the jury that the State was not seeking the punishment of life without parole, hence a verdict of guilty would result in life imprisonment. Id.  The jury was instructed to consider both first-degree murder and the lesser included offense of second degree murder. Id.  The jury found the defendant guilty of first-degree murder.

In addressing the issue, this Court stated that, for the defendant to have demonstrated that he was harmed by the challenged charge, he "must demonstrate that, but for the erroneous instruction, there is a reasonable probability the jury would have acquitted him of first-degree murder and found him guilty of the lesser offense of second degree murder or guilty of no offense at all." Id. at *4. In light of the evidence adduced at the trial, this Court concluded that "[i]t is, at best, improbable that the jury would have opted for second degree murder, much less acquittal, had the instruction been omitted." Id. See also State v. Steven Allen Jones, No. E2006-01952-CCA-R3-CD, 2007 WL 4226875, at *5-7 (Tenn. Crim. App., Knoxville, Dec. 3, 2007).

The case before us warrants a similar conclusion. The trial court instructed the jury on first-degree premeditated murder, attempted first-degree murder, second degree murder; attempted second degree murder, voluntary manslaughter, attempted voluntary manslaughter, reckless homicide, and criminally negligent homicide. The State's proof was that the Defendant, angry from a conversation with his girlfriend, Adrian Holmes, about the Defendant's continuing presence in her life, picked up his loaded semi-automatic pistol from the kitchen table and stated to her, "I hope you're happy; you just got him killed." The Defendant then left the apartment he shared with Holmes, drove thirteen miles to Grady Carter's house, where, upon seeing the unarmed victim in the street, he unloaded the weapon, striking the victim seven times in the chest, neck and left arm. The Defendant's theory was that he shot the victim out of fear and in self-defense. The jury clearly rejected the Defendant's explanation, and the proof was more than sufficient to support the jury's conclusion. The record contains no proof that the jury would have convicted the Defendant of any of the lesser included offenses, or acquitted him, had the challenged information not been provided. Because the trial court's error in instructing the jury about the penalties for first-degree murder does not "affirmatively appear to have affected the result of the trial on the merits," Tennessee Rules of Criminal Procedure 52(a), the Defendant is not entitled to a new trial on this ground. This issue is without merit.

## II. Testimony of Deputy Clark

The Defendant argues that the trial court erred in granting his motion for a mistrial when Sumner County Sheriff's Deputy Brandon Clark inadvertently testified that "the [D]efendant had been in trouble before." The trial court denied the motion for a mistrial and instructed the jury to disregard the statement. After a review of the record, we conclude that the trial court appropriately denied the Defendant's motion for a mistrial.

During direct examination, Deputy Clark was asked whether he knew that the Defendant carried a gun, and whether he and the Defendant had had any discussion about the Defendant carrying a gun, Deputy Clark responded, "We had talked about it a few times, and

I knew he had been in trouble before. I didn't think it was probably the best of ideas that he carried a gun." The Defendant objected to the testimony. He requested a mistrial outside the presence of the jury, during which he admitted that Deputy Clark's statement "was inadvertent" and "he probably didn't realize the significance of what he said." The State requested a curative instruction. Agreeing with the State, the trial court denied the motion for a mistrial and instructed the reconvened jury "to disregard the statement made by this witness that this defendant had been in, quote, trouble before, unquote. I can tell you affirmatively that this defendant had not been in trouble in a criminal, legal sense whatsoever."

The determination of whether to grant a mistrial rests within the sound discretion of the trial court. State v. Smith, 871 S.W.2d 667, 672 (Tenn. 1994). The reviewing court should not overturn that decision absent an abuse of discretion. State v. Reid, 91 S.W.3d 247, 279 (Tenn. 2002). The burden of establishing the necessity for mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). No abstract formula should be mechanically applied in making this determination, and all circumstances should be taken into account. State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See id.; State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999); Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981).

In State v. Demetrius Holmes, this Court noted that Tennessee does not have "any exacting standard" for determining when a mistrial should be declared, but suggested that the following criteria be examined when a witness has made an improper comment: "(1) whether the improper testimony resulted from questioning by the [S]tate, rather than having been a gratuitous declaration, (2) the relative strength or weakness of the [S]tate's proof, and (3) whether the trial court promptly gave a curative instruction." No. E2000-02263-CCA-R3-CD, 2001 WL 1538517, at *4 (Tenn. Crim. App., Knoxville, Nov. 30, 2001) (footnote omitted); see also State v. Bennie Nelson Thomas, Jr., No. W2004-00498-CCA-R3-CD, 2004 WL 2439405, at *4 (Tenn. Crim. App., Jackson, Nov. 1, 2004) (concluding that the trial court did not err when it failed to declare a mistrial when one witness referred to a "previous sale" with the defendant, who was on trial for selling crack cocaine).

We first note that Deputy Clark's comment was not elicited by the State and in fact was not responsive at all to the question asked by the State. Second, we note that the State's

proof in this case was quite strong. The Defendant admitted to shooting the victim. The only issue before the jury was the degree of his culpability. Third, the trial court gave a curative instruction to the jury not only to disregard Deputy Clark's statement but affirmed that the Defendant had never been in any legal trouble. Additionally, as the trial court noted in its oral findings at the hearing on the motion for a new trial, "Further, there was nothing in the record that came out during trial that even hinted that [the Defendant had been in trouble]. So I gave a correcting instruction and there's no prejudice." Thus, after reviewing the record, we conclude that the trial court did not abuse its discretion when it failed to declare a mistrial. The Defendant is not entitled to relief on this issue.

### III. Testimony of Sergeant Karl Haynie

The Defendant next contends that the trial court erred by allowing Westmoreland Police Sergeant Karl Haynie to testify as an expert that certain marks he found on the curb at the crime scene were consistent with ricochet marks from bullets. The State, however, argues that Sgt. Haynie was not offered as an expert witness and that his testimony as a lay witness was admissible. We agree.

As we begin our analysis, we note well-established precedent providing "that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." State v. McLeod, 937 S.W.2d 867, 871 (Tenn. 1996). Moreover, the Tennessee Rules of Evidence embody, and our courts traditionally have acknowledged, "a policy of liberality in the admission of evidence in both civil and criminal cases." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); State v. Robinson, 930 S.W.2d 78, 84 (Tenn. Crim. App. 1995). Further, "[i]t is well-settled that the propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge, subject to review for abuse of discretion." State v. Caughron, 855 S.W.2d 526, 540 (Tenn. 1993)

Rule 701(a) of the Tennessee Rules of Evidence addresses the admissibility of opinion testimony offered by non-experts. The rule provides, in relevant part:

> (a) If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are
> (1) rationally based on the perception of the witness; and
> (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Generally, non-expert witnesses must confine their testimony to a narration of the facts based on first-hand knowledge and avoid stating mere personal opinions or their conclusions or opinions regarding the facts about which they have testified. Blackburn v. Murphy, 737 S.W.2d 529, 531 (Tenn. 1987). An exception to this rule exists where testimony in an opinion form describes the witness's observations in the only way in which they can be clearly described, such as testimony that a footprint in the snow looked like someone had slipped or that a substance appeared to be blood. State v. Brown, 836 S.W.2d 530, 549-50 (Tenn. 1992).

Sergeant Haynie's testimony falls into this exception. During a jury out hearing, Sgt. Haynie identified a photograph he took of the curb near the victim's body. He testified that he took the picture, after locating the thirteen spent shell casings, "because it had indications of what we estimated to be bullet strikes . . . because they were inline with the body of Mr. Grady Carter" and because bullet fragments were found nearby on the street. He also testified that he was not a ballistics expert, but that he assumed these marks on the curb were ricochet marks given their proximity to the victim, the estimated trajectory of the bullets based on statements from eyewitnesses, and the position of the victim's body. The trial court allowed his testimony but admonished Sgt. Haynie not to make any statements about the exact nature of these marks. On direct examination, Sgt. Haynie testified consistently with his jury-out testimony and did not testify as to the exact nature of the marks on the curb.

Sergeant Haynie was not proffered as a ballistics expert and his testimony was limited to his observations and the appearance of the evidence found at the scene. Thus, the trial court did not abuse its discretion by admitting Sgt. Haynie's testimony about the appearance of the marks on the curb. This issue is without merit.

## IV. Autopsy Photographs

The Defendant next contends that the trial court erred in allowing the State to introduce two photographs taken by Dr. Deering during his autopsy of the victim. The Defendant objected to the introduction of the autopsy photographs as violative of Rule 403, Tennessee Rules of Evidence,which states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . or needless presentation of cumulative evidence." The Defendant contended at trial and maintains on appeal that the photographs were cumulative of the medical examiner's testimony and diagrams he used in support of his testimony. We disagree.

Admission of evidence under Rule 403 is also governed by an abuse of discretion standard. State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008). Trial courts have broad discretion in assessing relevance, and we will not overturn their decisions absent an abuse

of that discretion. State v. Stinnet, 958 S.W.2d 329, 331 (Tenn. 1997); State v. Dubose, 953 S.W.2d 649, 653 (Tenn. 1997). Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. See Banks, 564 S.W.2d at 949.

Notwithstanding, a photograph must be found relevant to an issue that the jury must decide before it may be admitted into evidence. See State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998); State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993); see also Tenn. R. Evid. 401. Photographs of a corpse are admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character, and photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used. See Collins v. State, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973). However, the probative value of the photograph must outweigh any unfair prejudicial effect that it may have upon the trier of fact. Vann, 976 S.W.2d at 103; Braden, 867 S.W.2d at 758; see also Tenn. R. Evid. 403. What is excluded is evidence which is "unfairly prejudicial," in other words, that evidence which has "an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." See Vann, 976 S.W.2d at 103 (citations omitted).

We, therefore, must first determine whether the photographs were relevant. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; Braden, 867 S.W.2d at 758.

The trial court conducted a jury-out hearing to examine the photographs proposed as exhibits to Dr. Deering's testimony and reviewed them together with the two drawings used by Dr. Deering during his testimony. Afterward, the trial court determined that the photographs were relevant because they show the repeated succession of bullets and "portray the external evidence of the victim's injuries in such a way that's not depicted in these diagrams."

The trial court also determined that the probative value of the photographs outweighed any prejudicial effect. The trial court reasoned as follows:

> What we have here is the victim's body lying on a table. You cannot see the victim's face. All you can do is you can see the back; they're not gruesome; they're not horrifying. There's no blood; there's no picture of his face; there's [sic] no autopsy marks, or cutting, or incisions. I feel that this assists the jury in showing where the injuries occurred as a probative value that outweighs the prejudicial effect. And, again, these pictures and wounds depicted of the injuries are very relevant to the [S]tate's case.

-12-

We have inspected the subject photographs and agree with the trial judge that their probative value outweighed any undue prejudicial effect. The Defendant argued at trial that the injuries he inflicted on the victim were in self-defense. Although medical testimony described the seven gunshot wounds to the victim in detail, our review shows that the admitted autopsy photographs remained quite probative in their ability to give context to the State's medical testimony, depict the extent and relative positions of the victim's injuries, and facilitate the jury's decision regarding the Defendant's argument that he shot the victim in self-defense. The photographs depict the "cleaned-up" gunshot wounds to the victim, congregated on the left rear shoulder and middle back area. They are not gruesome or bloody, and the victim's face is not visible in the photographs. Accordingly, there was no abuse of discretion in the trial judge's admission of the autopsy photographs.

## V. Flight Instruction

The Defendant contends that the evidence presented at trial failed to support a flight instruction and that the trial court erred by giving such an instruction to the jury. He concedes that he fled the scene of the shooting; however, he contends that, as required by the express language of the instruction, he did not hide, evade, or conceal himself in the community or leave the community for parts unknown. We disagree.

The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see also Tenn. R. Crim. P. 30. Following the presentation of the evidence, the trial court gave the jury the following instruction regarding flight:

> The flight of a person accused of a crime is a circumstance which, when considered with all the facts in the case, may justify an inference of guilt. Flight is the voluntary withdrawal of one's self for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the [D]efendant fled is a question for your determination.
>
> The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be a hurried or a concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

-13-

If flight is proved, the fact of flight alone does not allow you to find the [D]efendant guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight if flight is so proven, together with all the other evidence when you decide the guilt or innocence of the [D]efendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

Whether there was flight by the [D]efendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

See 7 Tennessee Practice, Tennessee Pattern Jury Instructions-Criminal 42.18 (9th ed. 2005). This pattern jury instruction is a correct statement of the applicable law and has been previously cited with approval by our court. See, e.g., State v. Kendricks, 947 S.W.2d 875, 885-86 (Tenn. Crim. App. 1996).

In order for a trial court to charge the jury on flight as an inference of guilt, sufficient evidence must exist to support the instruction. State v. Berry, 141 S.W.3d 549, 588 (Tenn. 2004). Sufficient evidence supporting such instruction requires "'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community.'" State v. Burns, 979 S.W.2d 276, 289-90 (Tenn. 1998) (quoting State v. Payton, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989)).

The transcript of the jury instructions is not included in the record on appeal. Only the type-written instructions of the court are included in the technical record. The State preliminarily argued in its brief on appeal that the issue has been waived for this reason. However, the State then retracted the waiver by arguing that "for purposes of this appeal, the State assumes that the typewritten instructions were given to the jury." In light of the State's concession, and the fact that the Defendant is not challenging the actual wording of the instruction but rather the sufficiency of the evidence to support the giving of the instruction, we choose to address this issue on the merits.

As the trial court found in this case, the Defendant fled the scene of the shooting, discarded the gun, and drove around the back roads of Sumner county for several hours before he turned himself in, despite the earlier pleas from his friend Brandon Clark to turn himself in. Even taking the Defendant's testimony as true, that he did not drive around for hours, but rather went to his mother's house, he still "hid out" in the community for some period of hours before he turned himself in to police. In our view, the evidence at trial established both a "leaving the scene" and a "hiding out" sufficient to warrant an instruction on flight. In consequence, the trial court did not err by providing the instruction.

-14-

## VI. Sufficiency of the Evidence

The Defendant next contends that there was insufficient evidence of premeditation to support his first-degree murder conviction. Specifically, he posits that the proof failed to demonstrate that he was not sufficiently free from excitement and passion as to be capable of premeditation. Our review of the record reveals just the contrary. The evidence overwhelmingly supports the jury's verdict that the Defendant had ample time to reflect upon his actions as he drove thirteen miles with a loaded weapon to the victim's house before shooting him.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

First-degree murder is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). The statute further states that:

'[P]remeditation' is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for a definite period of time.

Tenn. Code Ann. § 39-13-202(d). Circumstances indicative of premeditation include: use of a deadly weapon on an unarmed individual; the particular cruelty of the killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; making preparations to conceal the crime before the crime is committed; destruction or secretion of evidence of the killing; and the defendant's calmness immediately after the killing. State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005). Many of these circumstances are present in this case and support the jury's finding of premeditation.

After arguing with Adrian Holmes over messages she received from the victim, the Defendant grabbed his loaded weapon from the kitchen table in their apartment and told Holmes, "I hope you're happy; you just got him [Carter] killed." The Defendant then drove thirteen miles from the apartment he shared with Holmes to the victim's house, a drive which took twenty minutes. Upon seeing the victim in the street, the Defendant got out of his car, and as the victim raised his hands in the air, the Defendant opened fire on the unarmed victim. The Defendant continued firing on the victim even after he had fallen to the ground. The autopsy revealed that the victim had been struck repeatedly in the back and once in the neck. After leaving the scene, the Defendant tossed the weapon out of his car window and drove around Sumner County for some period of time. During that time, he had a conversation with his friend Brandon Clark, in which he admitted that the shooting had been premeditated. When Clark told him that the victim had not died, the Defendant told him that he believed the victim would die based on the wounds he knew he had inflicted upon him.

Though the Defendant recognizes that "there may have been evidence of premeditation," he contends that after months of verbal harassment from the victim over his relationship with Holmes, the victim's ex-girlfriend, his state of mind was not sufficiently free from passion or excitement as to be capable of premeditation. The record indicates that the victim had made repeated derogatory and threatening comments to the Defendant over a period of several months, but those comments had ceased a few months before the shooting. In fact, the Defendant testified that just two days before the shooting, he and the victim had had a good talk.

After reviewing the evidence in the light most favorable to the State, we conclude that there was ample evidence of premeditation to support a verdict of first-degree murder. The Defendant stated that he was going to kill the victim; he procured a weapon and then drove

for twenty minutes to the victim's house where he opened fire on the unarmed victim. All of this evidence is more than sufficient to support the jury's verdict.

## VII. Denial of Request for Self-Defense Jury Instruction

The Defendant argues that the trial court erred in denying his request for a jury instruction on self-defense based on his testimony that he panicked when he saw the victim approach his car with his hands up. The trial court, however, determined that the Defendant's actions of taking a loaded weapon to a confrontation he initiated did not entitle him to self-defense instruction. We agree.

The defense of self-defense is expressly provided for in Tennessee by statute and is defined, in relevant part, as follows:

> (a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Tenn. Code Ann. § 39-11-611(a).

A trial court has the duty to "give a complete charge of the law applicable to the facts of the case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986). This duty includes "giving jury instructions concerning fundamental issues to the defense and essential to a fair trial. . .." State v. Anderson, 958 S.W.2d 9, 17 (Tenn. Crim. App. 1998). See also Myers v. State, 206 S.W.2d 30, 32 (Tenn. 1947) (holding that a defendant is entitled to an affirmative instruction on self-defense if raised by the evidence). In deciding whether a defense instruction is warranted, the trial court "must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001).

Though the question of whether an individual acted in self-defense is a factual determination to be made by the jury, see State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993), our law also mandates that "[t]he issue of the existence of a defense is not submitted to the jury unless it is fairly raised by the proof." Tenn. Code Ann. § 39-11-203(c). Additionally, this Court is instructed to interpret the above statute to require that "[t]he

defendant has the burden of introducing admissible evidence that a defense is applicable." Id., Sentencing Commission Comments; see also State v. Leaphart, 673 S.W.2d 870, 873 (Tenn. Crim. App. 1983) (holding "[a]lthough it is well-settled that an accused is entitled to an affirmative instruction on every issue fairly raised by the evidence, there is no requirement that the court charge on matters not raised by the proof"). Thus, this Court may find error only if a jury charge "fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994).

Even considering the evidence in the light most favorable to the Defendant, we agree with the trial court that the evidence contained in the record does not raise a factual issue of self-defense. Though the Defendant testified that he was afraid of the victim based on months of harassing text mail and voice mail messages, the victim never physically harmed the Defendant or even attempted to. On the evening of the shooting, the Defendant decided that he had had enough of the victim's haranguing and drove thirteen miles to the victim's home, with a loaded semi-automatic weapon. Upon seeing the victim approach his car, with his hands raised in the air and bearing no weapon, the Defendant said he "panicked" and unloaded the entire magazine of twelve bullets plus the one bullet in the chamber in the direction of the victim. Seven shots penetrated the victim's left back, rear shoulder and arm area. Nothing in the record suggests that the Defendant acted to protect himself against the victim's use or attempted use of unlawful force. Accordingly, we conclude the trial court's refusal to instruct the jury on self-defense was not error.

## VIII. Cumulative Effect of Errors

Finally, the Defendant alleges that the cumulative effect of the errors in the trial court effectively denied him a fair trial. Having considered the entire record, we conclude that this argument is without merit.

## Conclusion

For the reasons articulated above, we affirm the Defendant's conviction for first-degree premeditated murder.

_____
DAVID H. WELLES, SPECIAL JUDGE

-18-